UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| JANICE L. FISCHER<br>(Social Security No. XXX-XX-8058),<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE, Commissioner<br>of Social Security,[1]<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

3:06-cv-78-RLY-WGH

**MEMORANDUM  DECISION AND ORDER**

**I.  Statement of the Case**

Plaintiff, Janice L. Fischer, seeks judicial review of the final decision of the

agency, which found her not disabled and, therefore, not entitled to Disability Insurance

Benefits ("DIB") or Supplemental Security Income ("SSI") under the Social Security Act

("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381(a); 20 C.F.R. § 404.1520(f).  The court

has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff filed her initial application for DIB and SSI on May 5, 1999, alleging

disability since January 2, 1999.  (R. 6-7, 124-25).  The agency denied Plaintiff's

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue, in his official
capacity only, is substituted as the Defendant in this action.

application both initially and on reconsideration.  (R. 32-37, 42-45).  After a hearing, the

ALJ, Anne C. Thomas, issued an unfavorable decision on January 18, 2001.  (R. 74-81).

Plaintiff filed a request for review on March 9, 2001.  (R. 86).  Apparently, at that time,

no decision by the Appeals Council was rendered.

Plaintiff then filed a second application for DIB and SSI on March 1, 2001,

alleging disability since January 19, 2001.  (R. 90-91).  The agency denied Plaintiff's

application both initially and on reconsideration. (R. 90).  The ALJ, Anne C. Thomas,

issued an unfavorable decision on September 22, 2003.  (R. 90-96).  The Appeals Council

denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of

the Commissioner.  (R. 90).  20 C.F.R. §§ 404.955(a), 404.981.[2]

Plaintiff applied a third time for DIB and SSI on January 28, 2004, alleging

disability since September 23, 2003.  (R. 6-7, 135-37).[3]  The agency denied Plaintiff's

application both initially and on reconsideration.  (R. 101-09).  On August 27, 2004, the

Appeals Council remanded Plaintiff's first application for benefits and ordered the

consolidation of Plaintiff's first application with her third application.  (R. 112-14).

Plaintiff then appeared and testified at a hearing before Administrative Law Judge

("ALJ") Marsha Stroup on November 2, 2004. (R. 511-39).  Also testifying was a

---

[2]Because Plaintiff never appealed the ALJ's decision from this second application period, Plaintiff is not entitled to benefits from the time period of January 19, 2001, to September 22, 2003.

[3]Plaintiff's insured status for DIB expired on December 31, 2003.  (R. 18).  Plaintiff, therefore, must demonstrate that she was disabled as of that date in order to receive DIB. *Stevenson v. Chater,* 105 F.3d 1151, 1154 (7th Cir. 1997).

2

vocational expert ("VE"). (R. 534-37). The ALJ issued an unfavorable decision on April 12, 2005. (R. 17-31). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 8-10). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on May 8, 2006, seeking judicial review of the ALJ's decision.

## II. Medical Evidence

### A. Plaintiff's Bladder Problems

Plaintiff had bladder surgery on March 30, 1999, and was discharged the next day. (R. 227). One month post-operatively, Plaintiff had good bladder support and was dry; she told her physician "she is now going to be permanently disabled because of her coronary artery disease and her pulmonary function." (R. 236).

### B. Plaintiff's Heart Problem

Plaintiff reported a history of myocardial infarction from 1996. (R. 237). A 1996 cardiac catheterization apparently revealed minimal coronary artery disease. (R. 256).

A January 1999 stress test revealed that Plaintiff had "[f]air exercise tolerance walking 6 minutes of a Bruce protocol achieving 7 METS." (R. 258, 471).

In March 1999, Plaintiff underwent EKG for upcoming bladder surgery. (R. 227-34). On March 26, 1999, an abnormal EKG revealed persistent T-wave inversion consistent with possible ischemia. (R. 253). On March 29, 1999, Plaintiff underwent a second EKG with stress test. (R. 237). During testing, there were no ischemic symptoms

and no significant arrhythmia; she had no evidence of prior infarction or ischemia.  (R. 237, 332).  She was cleared for bladder surgery and instructed to exercise, quit smoking, and lose weight.  (R. 237).  She smoked one-and-a-half packs of cigarettes per day.  (R. 229).

A May 1999 carotid doppler study showed "very mild" carotid disease without stenosis. (R. 259, 484).  Stress and other testing in June 1999 revealed no significant ischemia.  (R. 256-57).

A May 2004 EKG showed no changes from one performed in September 2000. (R. 507).  A May 2004 stress test showed very poor exercise tolerance and wheezing at the peak of exercise.  (R. 411-12).

**C.     Plaintiff's Respiratory Problems**

In August 1999, Gregory Fletcher, M.D., examined Plaintiff for complaints of shortness of breath with exertion; she claimed she could walk only one-half block.  (R. 241).  Plaintiff claimed at that time that "shortness of breath is really the limiting factor in terms of her claiming disability."  (R. 241).  Plaintiff smoked one-and-a-half packs of cigarettes per day for 37 years.  (R. 241).  Dr. Fletcher's pulmonary examination revealed "diminished breath sounds bilaterally," but no other abnormal results.  (R. 243).  Testing, including spirometry testing, was near normal; Plaintiff had an FEV1 of 63% which improved to 73% indicating "mild COPD."  (R. 243).

On August 20, 1999, Matthew R. Lee, M.D., opined that Plaintiff suffered from emphysema and was unable to work because of this.  (R. 252).

In February 2000, William S. Mullican, M.D., examined Plaintiff and noted essentially normal findings. (R. 265-67). Plaintiff had regular breathing rhythm, normal heart sounds, present carotid pulses of good quality, no audible arterial bruits; her lungs were clear to auscultation and percussion, and she had no rales, rhonci or wheezing. (R. 266). Musculoskeletal and neurological examinations were completely normal. (R. 266-67).

On November 22, 2000, Dr. Lee indicated that Plaintiff had emphysema, COPD, CAD and hypertension, causing shortness of breath and chest pain with any type of exertion unless she was allowed to lie down three to four times per day, for 30 minutes each, for relief. Dr. Lee opined that Plaintiff was unable to perform substantial work. (R. 302).

Dr. Lee treated Plaintiff between March 2001 and March 2004 for complaints of depression over the loss of her sister; skin problems; a broken toe; breast inflammation; and headaches. (R. 458-68, 479-80). He noted Plaintiff continued to smoke and had "bronchitis from this." (R. 468). Plaintiff reported headaches in October and November 2002 that caused her to pass out, but examination was normal; CT scan of her head then (and in September 2001) was normal. (R. 466-67, 477, 481). Other than reports of wheezing from smoking, checkups were normal. (R. 464). Dr. Lee told Plaintiff to quit smoking. (R. 464).

Thomas K. Browne, M.D., saw Plaintiff on October 10, 2000. (R. 294). Examination of Plaintiff revealed a "mild obstructive ventilatory impairment." (R. 294).

5

Dr. Browne continued to see Plaintiff between November 2000 and June 2004 about every six months for her bronchial problems.  (R. 425-31).  On November 15, 2000, Plaintiff was seen for a cold; "one of her grandchildren, for whom she babysits, had a virus."  (R. 431).  Plaintiff also planned to travel to Missouri for Thanksgiving.  (R. 431).

On May 12, 2001, Scott Piper, M.D., conducted a medical examination of Plaintiff.  (R. 338-39).  Dr. Piper found diminished lung sounds and breath sounds.  (R. 338).  But, other areas of examination revealed normal cardiac, musculoskeletal and neurological results and normal extremities except for trace edema bilaterally.  (R. 338-39).  That same day Plaintiff was provided a bronchodilator and instructed to take two puffs.  (R. 340).  Prior to taking her medication, Plaintiff had an FEV1 of 47%; after taking the medication, her FEV1 increased to 81%.  (R. 340).

In May 2001, Dr. Browne noted that Plaintiff was "getting along fair" and had reasonable PFT's (pulmonary function tests), but it was difficult to keep them there, especially given Plaintiff's continued smoking.  (R. 430).  In October 2001, he noted that Plaintiff was doing about the same; her "chest sounds pretty good."  (R. 429).  In May and August 2002, Dr. Browne noted that Plaintiff smelled of tobacco and continued to smoke; however, she was "doing fairly well with regards to her breathing" and was "not having any major trouble in that respect."  (R. 429).

In June 2003, Plaintiff reported shortness of breath and sweating with any exertion, but she "continues to smoke, of course."  (R. 427).  However, spirometry testing was actually "slightly better than one done a year ago."  (R. 427).  Dr. Browne indicated that

6

"from the pulmonary standpoint [Plaintiff] should not be as debilitated as she seems to be."  (R. 427).

On December 3, 2003, Dr. Browne noted that "the smoking becomes the other major variable, and that is something [she] can do for herself, and if she cannot kick that, she is simply going to have ever so much more of the respiratory problems as we go forward."  (R. 426).  Spirometry testing in June 2004 showed that Plaintiff moved air well and was "only mildly obstructed."  (R. 426).

On April 3, 2004, Johnathon Edge, M.D., examined Plaintiff for complaints of COPD and angina.  (R. 391-93).  Plaintiff reported difficulty with vacuuming and dusting, but still smoked one half a pack of cigarettes per day.  (R. 391).  Plaintiff complained of irritable bowel but denied any weakness or arthritis in her arms and legs.  (R. 392).  Lung examination revealed course rhonchi, but no wheezes or rubs.  (R. 392).  Dr. Edge noted that a physical examination was essentially normal; Plaintiff's COPD and angina were medically managed, and she was encouraged to quit smoking.  (R. 393).

In July 2004, Dr. Lee wrote a letter indicating Plaintiff could not return to her hairdresser profession due to the fumes and her exertion level being so low.  (R. 450).

**D.      Plaintiff's Sleep Disturbance and Headaches**

In August 2002, Plaintiff underwent a sleep study to evaluate "choking" in her sleep; it showed no severe sleep apnea.  (R. 356, 432).

Roderick L. Warren, M.D., saw Plaintiff on March 24, 2003, for reported headaches, chronic since age seven, but worse over the past two or three years.  (R. 347-

48).  Dr. Warren indicated that Plaintiff's claimed daily headaches were likely rebound

headaches due to her daily use of narcotic medication, and he instructed her to reduce her

use.  (R. 348).

**E.      Plaintiff's Mental Health**

      In April 2001, Jeffrey W. Gray, Ph.D., a psychologist, examined Plaintiff at the

request of the state agency.  (R. 334).  Plaintiff reported difficulty dealing with the death

of one sister, but she took care of her other sister, reporting that she would "[g]et her

meals, clean and dust her house."  (R. 335).  Psychological testing was essentially normal,

and Dr. Gray indicated her emotional status was "basically unremarkable."  (R. 336).

Plaintiff could handle work stress; be reliable and independent; remember simple work

rules; and relate and interact with co-workers and supervisors.  (R. 336).  Dr. Gray

assigned a Global Assessment of Functioning ("GAF") score of 70, indicating mild or no

symptoms.  (R. 337).

      William U. Weiss, Ph.D., a psychologist, consultatively examined Plaintiff in

April 2004, at which time Plaintiff reported she had depression and "nerves" but admitted

she had never seen a mental health provider or been hospitalized.  (R. 405-06).  Plaintiff

reported that she cooked, did dishes and laundry, vacuumed and crocheted sometimes.

(R. 409).  Though Plaintiff had the diagnostic criteria of dysthymic disorder, Dr. Weiss

assigned a GAF score of 65, showing mild impairment in functioning and mild

symptoms.  (R. 410).

**F.      Plaintiff's Carpel Tunnel Syndrome**

In March 2004, Plaintiff underwent an EMG study of her right hand which

revealed right median neuropathy.  (R. 376).  Plaintiff underwent carpal tunnel release in

April 2004.  (R. 395).  On April 19, 2004, Gary R. Moore, M.D., the physician who

treated Plaintiff's carpal tunnel syndrome, reported she was "having no real problems

with her hand," and in May 2004, she was doing well.  (R. 448).  Plaintiff fell in June

2004, and sprained her right wrist; in August 2004, her wrist pain was "a lot better," with

only "mild triggering" of her right thumb.  (R. 496).

**G.      Plaintiff's Other Treatment**

On June 13, 2000, Plaintiff underwent an arterial doppler examination of her legs

after reporting a history of claudication.  (R. 284).  The exam revealed normal results with

no evidence of significant peripheral vascular disease of the lower extremities.  (R. 284).

In September 2000, Plaintiff had a right-sided neck mass (benign cyst) surgically

removed.  (R. 270-77, 288, 290-93, 300-01, 367-70).  Prior to surgery, an EKG was

abnormal but not significant, and a chest x-ray was normal.  (R. 372-73).  After the

procedure she had an episode of respiratory distress which resolved.  In November 2000,

Plaintiff reportedly had "no new problems."  (R. 365).  Plaintiff underwent flexible

fiberoptic laryngoscopy which was normal.  (R. 366).

On May 16, 2001, Plaintiff underwent laryngoscopy for hoarseness and dysphasia

(difficulty swallowing).  (R. 363).  She was again noted to be a "heavy smoker."  (R.

363).  Plaintiff was advised to stop smoking.  (R. 363).

9

A May 2002 chest x-ray revealed no active disease.  (R. 439).  A CT scan of Plaintiff's sinuses was negative.  (R. 438).  In July 2002, Plaintiff took Prevacid for heartburn and reported she was better.  (R. 359).  In February 2003, Plaintiff reported heartburn and persistent GERD.  (R. 352-54).  She took Rolaids.  (R. 354).

In March 2003, Plaintiff underwent an upper endoscopy to evaluate swallowing difficulty, and a sigmoidoscopy for constipation; both were normal.  (R. 345, 385-87).

In April 2003, Plaintiff underwent a barium enema.  (R. 389-90).  In August 2003, Plaintiff underwent a CT scan of the pelvis which was normal.  (R. 388).

In March 2004, Gregory S. McCord, M.D., saw Plaintiff for a refill of gastrointestinal medication including "Zelnorm and Miralex;" the physician noted that Plaintiff "is without gastrointestinal complaints whenever she is on these medications, but she has recurrent difficulties with abdominal pain and constipation when these are discontinued."  (R. 378-79, 510).  Plaintiff underwent laryngoscopy in July 2004.  (R. 494).

## H.    State Agency Review

In September 1999, state agency physicians reviewed the evidence and concluded Plaintiff could lift 20 pounds occasionally and ten pounds frequently, and sit, stand and walk for six hours each in an eight-hour workday.  (R. 218).  She had no postural or manipulative limitations and needed to avoid concentrated exposure to extreme heat, cold, wetness and humidity.  (R. 219-21).

In August 2004, state agency physicians Dr. Whitely and Dr. Wenzler reviewed

10

the evidence and concluded Plaintiff could lift 20 pounds occasionally and ten pounds

frequently, sit, stand and walk for six hours each, and needed to avoid concentrated

exposure to extreme heat, cold and humidity, and fumes, odors, dusts, gases and poor

ventilation.  (R. 307, 310).  In February 2004, those same physicians offered a second

assessment that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, and

sit, stand and walk six hours each in an eight hour workday, with the same environmental

restrictions as before.  (R. 315, 318).  They noted Dr. Lee's opinion that Plaintiff needed

to rest periodically for 30 minutes and concluded the medical evidence did not support it.

(R. 320).

State agency psychologists reviewed the medical evidence and concluded Plaintiff

did not have a severe mental impairment.  (R. 322-27).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42

U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

*Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th

Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to

weigh the evidence, resolve material conflicts, make independent findings of fact, and

decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this court

may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that

of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus,

even if reasonable minds could disagree about whether or not an individual was

"disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v.

Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that

she suffers from a "disability" as defined by the Act.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of a medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential

five step test the ALJ is to employ in order to determine whether a claimant is disabled.

*See* 20 C.F.R. § 416.920.  The ALJ must consider whether the claimant:  (1) is presently

employed; (2) has a severe impairment or combination of impairments; (3) has an

impairment that meets or equals an impairment listed in the regulations as being so severe

as to preclude substantial gainful activity; (4) is unable to perform her past relevant work;

and (5) is unable to perform any other work existing in significant numbers in the national

economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four, and only

after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v.

Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

12

## V.  The ALJ's Decision

The ALJ, Marsha Stroup, concluded that Plaintiff was insured for DIB through December 31, 2003, and Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 30).  The ALJ continued by finding that, in accordance with 20 C.F.R. § 416.920(b), Plaintiff had five impairments that are classified as severe:  chronic obstructive pulmonary disease, arteriosclerotic disease, an unspecified sleep disorder, obesity and chronic headaches of an unknown etiology.  (R. 30).  The ALJ concluded that none of these impairments met or were substantially similar to any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 30).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 30).  Consequently, the ALJ concluded that Plaintiff retained the RFC for sedentary work with no exposure to fumes, dust, smoke or other pulmonary irritants.  (R. 30).  The ALJ determined that, because of these limitations, Plaintiff could not perform her past work.[4] (R. 30).  The ALJ noted that, as an individual who was 55 at the time of the ALJ's decision, Plaintiff was an individual of advanced age.  (R. 18, 30).  The ALJ also determined that Plaintiff had transferable skills.  (R.30).  The ALJ went on to conclude that Plaintiff retained the RFC to perform a limited range of sedentary work existing in substantial numbers in the regional economy.  (R. 30).  The ALJ concluded by finding

---

[4]The ALJ concluded that Plaintiff's past work included jobs as a hairstylist, beauty supply shop manager, and beauty school teacher, all of which were classified as light skilled jobs.  (R. 28).

that Plaintiff was not under a disability.  (R. 30).

## VI.  Issues

The court concludes that Plaintiff has essentially raised eight issues.  The issues are as follows:

1.  Whether the ALJ should have found that Plaintiff's carpel tunnel syndrome, right trigger thumb, irritable bowel syndrome, and gastroesophageal reflux disease were severe impairments.

2.  Whether the ALJ improperly failed to compare Plaintiff's sleep disorder, obesity and headaches to the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.

3.  Whether the ALJ improperly concluded that Plaintiff had transferable skills.

4.  Whether the ALJ failed to ask a proper hypothetical question to the VE about exposure to fumes or other irritants.

5.  Whether the ALJ's RFC determination failed to take into consideration Plaintiff's right thumb.

6.  Whether the ALJ's decision failed to comply with SSR 96-8p.

7.  Whether the ALJ conducted an improper credibility determination.

8.  Whether the ALJ improperly failed to give Dr. Lee's opinions controlling weight.

**Issue 1:      Whether the ALJ should have found that Plaintiff's carpel tunnel syndrome, right thumb triggering, irritable bowel syndrome, and gastroesophageal reflux disease were severe impairments.**

Plaintiff's first allegation is that the ALJ improperly failed to find several of Plaintiff's impairments to be severe.  An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities and has lasted or is expected to last for twelve months.  20 C.F.R. § 404.1520.

In this instance, the ALJ noted in her opinion that Plaintiff's irritable bowel syndrome was controlled by medication, carpel tunnel syndrome resolved after surgery,[5] and gastroesophageal reflux disease did not reveal any functional limitations.  (R. 25).  With regard to Plaintiff's carpel tunnel syndrome and right thumb triggering, the medical evidence reveals that only four months after Plaintiff's surgery she was doing "a lot better" with only mild triggering in her thumb.  (R. 496).  The medical evidence also reveals that Plaintiff was without gastrointestinal complaints when she was on medication.  (R. 378-79).  And, results of a sigmoidoscopy were normal.  (R. 345).  Therefore, there was substantial evidence to support the ALJ's determination that these were not "severe" impairments.

**Issue 2:      Whether the ALJ improperly failed to compare Plaintiff's sleep disorder, obesity and headaches to the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.**

Plaintiff next argues that the ALJ failed to compare three of her severe impairments to those in the listings located in 20 C.F.R. Part 404, Subpart P, Appendix 1. If an impairment meets one of these listings, it is automatically disabling, and a claimant

_____

[5]Plaintiff's carpel tunnel syndrome and right thumb trigger both did not manifest themselves until after Plaintiff's insured status for DIB expired.  Therefore, even if those impairments had been severe, they would only have been considered for the purposes of Plaintiff's SSI.

is entitled to benefits.  20 C.F.R. § 404.1520.  In some instances, failure to specifically

refer to a numbered listing could be problematic.  *Brindisi ex rel. Brindisi v. Barnhart,*

315 F.3d 783, 786 (7th Cir. 2003)(holding that "failure to discuss or even cite a listing,

combined with an otherwise perfunctory analysis, may require a remand").

Here, the ALJ clearly noted that she examined Listing 3.10 for sleep-related

breathing disorders and concluded that Plaintiff did not meet that listing.  The ALJ also

explained that she considered SSR 02-01p concerning the evaluation of obesity.  (R. 25).

Although no mention by the ALJ in the record is made of a comparison between the

listings and Plaintiff's headaches, Plaintiff does not explain which portions of the listings

should have been considered or why her headaches met or substantially equaled a given

listing.  Absent any evidence from Plaintiff that demonstrates why her headaches met a

given listing, the court is unable to conclude that the ALJ committed error.

**Issue 3:**      **Whether the ALJ improperly concluded that Plaintiff had transferable skills.**

Plaintiff also alleges that the ALJ's decision regarding Plaintiff's transferable skills

was in error.[6]  An individual who is age 55 or older with a high school education or

higher who has previous work only at the skilled or semi-skilled level and the skills from

that previous work are not transferable is disabled.  *See* 20 C.F.R. Part 404, Subpart P,

Appendix 2.  Hence, it is important to determine if an individual who is 55 or older, such

---

[6]Plaintiff's insured status for DIB expired prior to her attainment of age 55.  Because there are no special rules concerning transferability of skills prior to the attainment of age 55, the transferability of Plaintiff's skills is only pertinent with regard to her application for SSI.

16

as Plaintiff, has transferable skills.  In order to make this determination, 20 C.F.R. §

416.968 explains, in part:

> (4)  Transferability of skills for individuals of advanced age.  If you are of
> advanced age (age 55 or older), and you have a severe impairment(s) that
> limits you to sedentary or light work, we will find that you cannot make an
> adjustment to other work unless you have skills that you can transfer to
> other skilled or semiskilled work (or you have recently completed education
> which provides for direct entry into skilled work) that you can do despite
> your impairment(s).  We will decide if you have transferable skills as
> follows.  *If you are of advanced age and you have a severe impairment(s)
> that limits you to no more than sedentary work, we will find that you have
> skills that are transferable to skilled or semiskilled sedentary work only if
> the sedentary work is so similar to your previous work that you would need
> to make very little, if any, vocational adjustment in terms of tools, work
> processes, work settings, or the industry.*

20 C.F.R. § 416.968(d)(4) (emphasis added).

The ALJ's discussion of Plaintiff's RFC and the transferability of her skills can be

found at pages 27-29 of the Record.  The ALJ found that Plaintiff only retained the RFC

for sedentary work.  Therefore, the ALJ was required to analyze the available jobs that

Plaintiff's skills would transfer to and determine if the sedentary work was "so similar to

[her] previous work that [she] would need very little, if any, vocational adjustment. . . ."

In this instance, the ALJ's decision is void of any such discussion, nor is there any

reference to 20 C.F.R. § 416.968 or  20 C.F.R. § 404.1568 (its DIB counterpart).

It is true, as the Commissioner points out, that SSR 82-41 provides context and

explains that "where job skills have universal applicability across industry lines, e.g.,

clerical, professional, administrative, or managerial types of jobs, transferability of skills

to industries differing from past work experience can usually be accomplished with very

little, if any, vocational adjustment where jobs with similar skills can be identified as being within an individual's RFC."  Nevertheless, the ALJ was still required to discuss whether the four jobs that she found Plaintiff's skills could transfer to (general office clerk, bookkeeper, accounting clerk and receptionist) required very little if any vocational adjustment.  *Tom v. Heckler,* 779 F.2d 1250, 1256-57 (7th Cir. 1985)(holding that remand is required when the ALJ fails to properly assess the impact of a claimant's age on the transferability of their skills).  The court notes that, according to the <u>Dictionary of Occupational Titles</u> (DOT) 209.562-010, one of these jobs, general office clerk, is classified as light work which the ALJ found Plaintiff could not perform.  It was, therefore, not a proper part of the ALJ's consideration.  Additionally, while the remaining three jobs and Plaintiff's past work both involve the types of clerical skills that SSR 82-41 explains are "usually" transferrable with very little vocational adjustment, it is unclear if this is really the case given Plaintiff's testimony that she has essentially no computer skills.  On remand, the ALJ must assess whether there are jobs available to Plaintiff that require little or no vocational adjustment in terms of tools, work processes, work settings, or the industry.

**Issue 4:      Whether the ALJ failed to ask a proper hypothetical question to the VE about exposure to fumes or other irritants.**

Plaintiff next argues that the ALJ's RFC and her hypothetical question to the VE are not consistent.[7]  The ALJ found that Plaintiff retained the RFC for sedentary work

---

[7]Plaintiff also found fault in the ALJ's limitation to no exposure to pulmonary irritants because she claims it did not comport with SSR 96-9p.  However, SSR 96-9p explains that

with "no exposure to fumes, dust, smoke or other pulmonary irritants."  (R. 30).  The

ALJ's hypothetical question posed to the VE suggested that the VE needed to list jobs

where Plaintiff "wouldn't be exposed to strong fumes or other kinds of air pollutants."

(R. 535).  There is nothing inconsistent between the hypothetical and the RFC.

Therefore, the ALJ did not commit an error in the hypothetical question she asked.

**Issue 5:       Whether the ALJ's RFC determination failed to take into
                consideration Plaintiff's right thumb.**

Plaintiff's next argument is that the ALJ failed to incorporate Plaintiff's right

thumb triggering into Plaintiff's RFC.  As the court noted above, it was not error for the

ALJ to conclude that Plaintiff's right thumb/carpel tunnel syndrome were not severe

impairments.  The ALJ came to a reasonable conclusion that Plaintiff's right thumb

triggering "was first diagnosed in August 2004, and has not lasted one year.  Further, it

may not last one year depending on whether treatment with steroid injections is

successful."  (R. 25).

Later in her decision the ALJ concluded that "[o]ther than her questionable ability

to grip, the claimant can perform fine manipulation and reaching."  (R. 27).  Plaintiff

suggests that, by this language, the ALJ was concluding that Plaintiff had poor grip

strength, and that that should have been incorporated into Plaintiff's RFC.  However,

---

"[r]estrictions to avoid exposure to odors or dust must also be evaluated on an individual basis.
The RFC assessment must specify which environments are restricted and state the extent of the
restriction; e.g., whether only excessive or even small amounts of dust must be avoided."  That is
exactly what the ALJ's RFC assessment did in this instance; it provided which environments are
restricted (fumes, dust, smoke or other pulmonary irritants) and the extent of Plaintiff's
restriction (no exposure).

given the ALJ's previous reference to Plaintiff's right thumb triggering and the lack of medical evidence in the record concerning abnormal grip strength, it is reasonable to conclude that the ALJ was questioning whether Plaintiff really had any problems with grip strength. The court is capable of tracing the path of the ALJ's reasoning on this issue, and remand is unnecessary.

**Issue 6:       Whether the ALJ's decision failed to comply with SSR 96-8p.**

Plaintiff also argues that the ALJ's decision did not comply with SSR 96-8p. That particular Social Security ruling provides that a function-by-function assessment of a person's ability to do work-related activities must be performed detailing an individual's RFC.

In this instance, the ALJ concluded that Plaintiff retained the RFC to perform a full range of sedentary work with the only limitation being no exposure to fumes or other pulmonary irritants. (R. 27). The ALJ noted in a footnote that the RFC for sedentary work included the ability to carry ten pounds for up to one-third of an eight-hour work day and the ability to walk or stand for no more than one-third of an eight-hour workday. (R. 27). The ALJ noted Plaintiff's complaints of swelling but concluded that "regular breaks customarily allowed during an eight-hour workday" would alleviate this symptom. (R. 27). The ALJ also noted that sedentary work would be less taxing with regard to Plaintiff's pulmonary impairment and her fatigue. (R. 27-28). In examining this analysis and SSR 96-8p, the court concludes that this is exactly the sort of function-by-function analysis contemplated by that Social Security ruling. Nothing in this analysis ran afoul of

SSR 96-8p, and the ALJ's RFC assessment is, therefore, supported by substantial evidence.

**Issue 7:       Whether the ALJ conducted an improper credibility determination.**

An additional argument that Plaintiff makes is that the ALJ's credibility determination was flawed.  The Seventh Circuit has noted that an ALJ's credibility determination will not be overturned unless it is "patently wrong."  *Powers v. Apfel,* 207 F. 3d 431, 435 (7th Cir. 2000).  SSR 96-7p states that the ALJ's decision regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Golembiewski v. Barnhart,* 322 F.3d 912 (7th Cir. 2003).

The ALJ discussed Plaintiff's hearing testimony as follows:

The claimant confirmed at the hearing that she continues to smoke one-half of a pack of cigarettes a day, but that she was trying to quit.  She said she is inactive.  She said she uses inhalers and nebulizers.  During the winter, she gets colds and pneumonia.  She said she could not get a flu shot the preceding winter.  Her breathing problems are caused by overexertion.  She has occasional chest pain.  She has daily headaches.  She still takes two Darvocet pills up to four times daily when she has a headache.  The headaches make her nauseous.  She lies down in a dark room.  Due to irritable bowel syndrome, she is constipated.  Medication helps as long as she takes it.  She also confirmed that she had carpel tunnel syndrome and a right trigger thumb.  She cannot think clearly when her headaches are severe.  When she moves around, she breaks out in a sweat.  She used to have bladder problems.

The claimant says she performs housework a little at a time.  She can stand

21

and walk up to 15 minutes at a time.  When she sits, her hands and feet
swell.  She is on a diuretic.  Her hands also go to sleep.  She usually goes
grocery shopping once per month, and usually with someone else.  Her
daughter-in-law does the laundry, carrying it up and down the steps for her.
She does not sleep well.  She crochets and watches soap operas on
television.  She reads.  She gets out of her house to pick up medications and
to visit her physicians.  Her stamina is 'not good at all,' and her energy
level was 'way down.'  She confirmed that her blood pressure was under
control.

(R. 24-25).  The ALJ went on several paragraph's later to discuss Plaintiff's credibility by

explaining:

> The claimant described performing a limited range of activities of daily
> living at the hearing.  She is unable to do the laundry and she must perform
> housecleaning a little at a time.  She experiences shortness of breath with
> almost any activity.  She sometimes experiences chest pain, but according
> to the documentary medical evidence, the pain has largely abated.  She
> experiences daily headaches without any specific precipitating factors.  She
> is on a considerable number of medications.  Some of her treatment notes
> indicate that medication effectively controlled her symptoms, but more
> recently she indicated it did not.  She uses nebulizers and inhalers to treat
> her breathing problems.  The claimant has consistently refused to stop
> smoking despite remarkably frequent and strong advisements from her
> physicians that she do so.  Having considered the forgoing factors, the
> Administrative Law Judge concludes that the claimant's testimony and
> statements regarding the nature and severity of her symptoms and
> limitations is partially credible.

(R. 26).  While the ALJ found Plaintiff's statements "partially credible," there was no

significant discussion about why Plaintiff was not fully credible.  Specifically concerning

to the court was Plaintiff's testimony at her hearing that she had almost daily headaches,

and that she had to lay down in a dark room for approximately 30 minutes when these

headaches would occur.  Plaintiff explained that she would have to take up to four

Darvocet pills in order to alleviate her symptoms.  At Plaintiff's hearing, the ALJ

recognized Plaintiff's headaches and conceded that Darvocet was "pretty heavy duty stuff." (R. 525). Yet, the ALJ's discussion about Plaintiff's testimony and credibility does not provide any rationale for why Plaintiff's testimony about her headaches was not fully credible. This was not adequate. On remand the ALJ must make specific findings as to why Plaintiff's testimony was not fully credible in accordance with SSR 96-7p.

**Issue 8:**      **Whether the ALJ improperly failed to give Dr. Lee's opinions controlling weight.**

Plaintiff's final argument was that the ALJ failed to give controlling weight to the opinions of one of her treating physicians, Dr. Lee. A treating physician's opinions are generally entitled to controlling weight. *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). However, an ALJ may reject the opinions of a treating physician if they are based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).

In August 1999, Dr Lee opined that Plaintiff suffered from emphysema and was unable to work because of this impairment. (R. 252). In a November 2000 letter, Dr. Lee opined that, in order to work, Plaintiff would need to lie down three to four times per day, for 30 minutes each for relief. (R. 302). In July 2004, Dr. Lee wrote yet another letter explaining that Plaintiff could not return to her past work as a hairdresser because of fumes and because of her low exertion level. (R. 450). The ALJ concluded that Dr. Lee's opinions were not entitled to controlling weight because they were internally

inconsistent, because Dr. Lee misunderstood the definition of "disabled," and because other medical evidence in the record did not support his opinions.

After examining the evidence, the court concludes that the ALJ's decision to deny controlling weight to Dr. Lee's opinions is supported by substantial evidence. In May 2001, Plaintiff's FEV1 increased to 81% after use of a bronchodilator. (R. 340). In June 2003, Dr. Browne, another physician treating Plaintiff's breathing problems, explained that Plaintiff's spirometry tests were slightly improved, and he opined that she actually should not be as bad off as she seems to be. (R. 427). Spirometry testing in June 2004 showed that Plaintiff moved air well and was "only mildly obstructed." (R. 426). In February 2004, state agency physicians reviewed Dr. Lee's opinion that Plaintiff needed to rest for 30 minutes at a time and concluded that the medical record simply did not support such a conclusion. (R. 320). This evidence suggests that the ALJ was reasonable in concluding that Dr. Lee's opinions were inconsistent with other medical evidence in the record. A reasonable ALJ could have examined this evidence and concluded that Plaintiff's breathing was not as impaired as Dr. Lee suggested. Hence, the ALJ's decision on this matter is affirmed.

## VII.  Conclusion

This case is **REMANDED** for two reasons. First, on remand, the ALJ must consider whether Plaintiff had transferable skills after she turned 55 in accordance with 20 C.F.R. § 416.968. Second, the ALJ's credibility determination did not address in all

respects the requirements of SSR 96-7p.  On remand, the ALJ shall discuss Plaintiff's

credibility in greater detail.


**SO ORDERED** the 30th day of July 2007.


_____

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana




Electronic copies to:

Eric Joseph Yocum
eric_yocum@msn.com


Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov